UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SELECTIVE INSURANCE COMPANY OF THE SOUTHEAST, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:06-cv-0760-DFH-TAB |
| CAGNONI DEVELOPMENT, LLC, MARILYN MASON d/b/a FRANK MASON REAL ESTATE, and RAIN-MASTER, INC., | ) ) ) ) | |
| Defendants. | ) ) ) | |

ENTRY ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This case involves a dispute over damages caused by the allegedly faulty design and installation of a roof on a commercial warehouse. Plaintiff Selective Insurance Company of the Southeast brought this action seeking a declaratory judgment to clarify its coverage obligations based on the policy held by Rain-Master, Inc., the company who designed and installed the roof. Cagnoni Development, LLC, the manager of the building that contracted to have the roof installed, and Marilyn Mason, the owner of the building, filed counterclaims seeking a declaratory judgment that certain categories of damages it sustained are covered under the policy. Both sides have moved for partial summary judgment. Selective Insurance has requested summary judgment declaring that it is not responsible for covering the costs of repair, removal, or replacement of Rain-

Master's roof and that it does not owe Cagnoni attorney fees and costs.  Cagnoni seeks a judgment declaring that the policy covers all property damage, including lost rent, lost use, and all other consequential damages.  As explained in detail below, the court grants Selective Insurance's motion for summary judgment on the issues of repair, removal, and replacement of the Rain-Master roof and attorney fees and costs.   The court grants Cagnoni's motion for summary judgment on damage to property inside the warehouse, clean-up costs, and  loss of use and loss of rent, but denies Cagnoni's motion with respect to damage to the pre-existing roofs, steel deck, and interior of the warehouse.

## Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving parties.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, a court's ruling on a motion for summary judgment is akin to that on a ruling on a motion for a directed verdict.  The question for the court in both

is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. Genuine disputes over material facts can prevent a grant of summary judgment. *Id.* at 247-48. A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248.

When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 255. However, a party must present more than mere speculation or conjecture to defeat a summary judgment motion. The issue is whether a reasonable jury might rule in favor of the non-moving party based on the evidence in the record. *Anderson*, 477 U.S. at 251-52.

The fact that both sides have filed motions for summary judgment does not alter the applicable standard; the court must consider each motion independently and will deny both motions if there is a genuine issue of material fact. See, *e.g.*, *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993); *Harms v. Laboratory Corp. of America*, 155 F. Supp. 2d 891, 905-06 (N.D. Ill. 2001). Thus, in considering cross-motions for summary judgment, the court must consider the

evidence through two lenses.  When considering Selective Insurance's motion for summary judgment, the court must give Cagnoni and Mason the benefit of all conflicts in the evidence and the benefit of all reasonable inferences that might be drawn from the evidence in their favor, even if the evidence or the inferences seem improbable.  When considering Cagnoni's and Mason's motion for summary judgment, the roles are reversed.

*Facts for Summary Judgment*

In 2001, Marilyn Mason d/b/a Frank Mason Real Estate ("Mason") purchased property located at 6003 Guion Road in Indianapolis, Indiana, which includes a two-level warehouse.  Cagnoni Development, LLC manages this property for Mason.  When Mason purchased the property, the warehouse needed a new roof.  Cagnoni Dep. 10.  The roof at that time consisted of steel decking and two separate built-up roofs.[1]

Cagnoni hired Rain-Master, Inc. to design and install a roof for the warehouse beginning in August 2002.  On top of the existing roofs and steel decking, Rain-Master installed a roof made of zinc and aluminum-coated steel sheets.  Rain-Master began installing the roof in September 2002 and completed the work in April 2003.

---

[1] A "built-up roof" is a hot tar roof, built in stages, overlapping felt paper and hot asphalt and coated with stone.  Feldhaus Dep. 24.

Cagnoni and tenants of the warehouse called Rain-Master several times in the months following the installation of the roof to report that the roof was leaking. Feldhaus Dep. 128, 131-32. Rain-Master installed twenty roof drains in the roof in an attempt to stop the leaks. To create these drains, Rain-Master cut holes through the Rain-Master roof, the pre-existing roofs, and into the steel decking. Rain-Master then installed PVC pipe from the roof drains through walls in the interior of the warehouse. Feldhaus Dep. 134-136.

Despite these measures, water continued to leak into the warehouse. As recently as March 2007, water came through the roof and penetrated through to the first floor of the warehouse, damaging one tenant's products. As a result of the leaking roof, Cagnoni and Mason (hereinafter referred to jointly as "Cagnoni") have not been able to use the space on the second floor of the warehouse or to offer it to potential renters.

On September 2, 2005, Cagnoni filed a complaint in this federal court against Rain-Master alleging negligence and breach of contract based on failure to design and install an effective roof. See *Cagnoni Development, LLC v. Rain-Master, Inc.*, No. 1:05-cv-1316-DFH-TAB (S.D. Ind.). Cagnoni alleged a variety of damages to the warehouse and the roof system. Cagnoni filed an amended complaint on December 8, 2006. That case remains pending while this dispute over insurance coverage is resolved.

At all relevant times, Rain-Master had a Commercial General Liability ("CGL") policy with plaintiff Selective Insurance Company of the Southeast. Selective has provided Rain-Master with a defense to the Cagnoni complaint subject to a reservation of rights. See Def. Exs. O & P. Selective retained attorney Chris McGrath to represent Rain-Master in the liability suit. In April 2006, Selective "separated its files" on the issues of Rain-Master's liability and Rain-Master's coverage under the CGL policy. Klase Dep. 17.

Rain-Master requested that Selective indemnify it against all claims asserted against by Cagnoni. Selective filed this declaratory judgment action seeking a declaration of its rights and obligations under its policy with Rain-Master with regard to the suit by Cagnoni against Rain-Master. Cagnoni filed a counterclaim against Selective seeking a declaration that Selective is obligated to pay for "all past and future losses associated with the Two-Level Warehouse. . . ." Counterclaim ¶ 5.

Additional facts are noted where relevant, keeping in mind the standard applicable on summary judgment.

*The Policy*

The motions address numerous provisions in Rain-Master's CGL policy including the following:

Section I - Coverages
Coverage A Bodily Injury and Property Damage Liability
1.     Insuring Agreement
       a.      We will pay those sums that the insured becomes legally obligated to
               pay as damages because of "bodily injury" or "property damage" to
               which this insurance applies.  We will have the right and duty to
               defend the insured against any "suit" seeking those damages.
               However, we will have no duty to defend the insured against any
               insured against any [sic] "suit" seeking damages for "bodily injury" or
               "property damage" to which this insurance does not apply.
                                          *     *     *
       b.      This insurance applies to "bodily injury" and "property damage" only
               if:
               (1) The "bodily injury" or "property damage" is caused by an
               "occurrence" that takes place in the "coverage territory"
                                          *     *     *
2.     Exclusions
This insurance does not apply to:
                                          *     *     *
       k.      Damage to Your Product
               "Property damage" to "your product" arising out of it or any part of it.

       l.      Damage to Your Work
               "Property damage to "your work" arising out of it or any part of it and
               included in the "products-completed operations hazard".
                                          *     *     *
       m.      Damage to Impaired Property or Property Not Physically Injured
               "Property damage" to "impaired property" or property that has not been
               physically injured, arising out of:
                       (1) A defect, deficiency, inadequacy or dangerous condition in "your
                       product" or "your work"; or
                       (2) A delay or failure by you or anyone acting on your behalf to
                       perform a contract or agreement in accordance with its terms.

                       This exclusion does not apply to the loss of use of other property
                       arising out of sudden and accidental physical injury to "your product"
                       or "your work" after it has been put to its intended use.
                                          *     *     *
Section V - Definitions
                                          *     *     *
8.     "Impaired property" means tangible property, other than "your product" or
       "your work", that cannot be used or is less useful because:
       a.      It incorporates "your product" or "your work" that is known or
               thought to be defective, deficient, inadequate or dangerous; or

      b.     You have failed to fulfill the terms of a contract or agreement

*   *   *

13.   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*   *   *

17.   "Property damage" means:

      a.     Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

      b.     Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*   *   *

20.   "Your product" means:

      a.     Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

          (1) You;

*   *   *

"Your product" includes:

      a.     Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"

*   *   *

21.   "Your work" means:

      a.     Work or operations performed by you or on your behalf; and

      b.     Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

      a.     Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work . . . ."

*Discussion*

This case is before the court based on diversity jurisdiction, and the parties have agreed that Indiana law applies. The court must apply the law of the state as it predicts the highest court of the state would apply it. *Wolverine Mutual Insurance v. Vance ex rel. Tinsley*, 325 F.3d 939, 942 (7th Cir. 2003). When the state supreme court has not decided an issue, the federal courts should place great weight on rulings of the state appellate courts absent persuasive indications that the state's supreme court would decide the case differently. *State Farm Mutual Automobile Insurance Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001), citing *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237 (1940).

Under Indiana law, an insurer or a third party may file a declaratory judgment action to clarify the insurer's coverage obligations with respect to a loss by a policy holder. See *Briles v. Wausau Insurance Cos.*, 858 N.E.2d 208, 212 (Ind. App. 2006) (insurer filed action for declaratory judgment disputing coverage under a policy); see also *Community Action of Greater Indianapolis, Inc. v. Indiana Farmers Mutual Insurance Co.*, 708 N.E.2d 882, 886 (Ind. App. 1999) (holding that a third party may file declaratory judgment against insurer despite prohibition in Indiana against direct action suits). It is possible, and sometimes may even be preferable, to file such an action before the underlying claim against the policy holder has been resolved. As in this case, the third party victim of an insured's (alleged) wrongdoing may have an interest in determining the extent of the insurance

coverage before she expends time, money, and resources obtaining a judgment against an insured from whom she has little chance of collecting directly.  See *Wilson v. Continental Casualty Co.*, 778 N.E.2d 849, 852 (Ind. App. 2002) (holding that injured victim may seek declaratory judgment on insurance coverage when insurer denies coverage or defends under reservation of rights).

An injured third party, however, is not legally entitled to have an insurer actually pay damages caused by the insured unless and until there has been a finding of liability in the underlying suit.  See *Wolverine*, 325 F.3d at 944 (applying Indiana law); *Cromer v. Sefton*, 471 N.E.2d 700, 703 (Ind. App. 1984) (stating that a third party cannot bring a direct action against an insurer unless he first obtains a judgment against the insured that the insurer refuses to indemnify).  In a case in which there has been no previous finding of liability, a declaratory judgment does not assign specific dollar values to damages that the insurer must cover; the judgment may simply clarify which categories of damages the insurer may be responsible for indemnifying if the third party victim can prove in the underlying suit that the insured is liable for those damages.

I.     *Alleged Bad Faith*

As a threshold matter, Cagnoni asserts that Selective breached its duty of good faith to its insured, Rain-Master, when it (a) failed to notify Rain-Master of its conflict of interest in defending Rain-Master against liability claims while

simultaneously disputing its own coverage obligations, (b) did not advise Rain-Master of its right to independent counsel of its choice that would be funded by Selective, and (c) did not promptly separate its coverage and liability files.  Def. Mot. 26-27.  Cagnoni argues that if Selective acted in bad faith in its dealings with Rain-Master, Selective should be estopped from raising any policy defenses or exclusions to dispute coverage of Cagnoni's claims.  Cagnoni argues that the court should not grant summary judgment in favor of Selective on any of its claims regarding coverage because questions of material fact exist regarding whether Selective breached its duty of good faith to Rain-Master.

Under Indiana law, an insurance company may be estopped from asserting its rights under a policy if it would be inequitable to permit the assertion of those rights.  *Employers Insurance of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1028 (Ind. App. 1999).  Generally, estoppel does not extend the coverage of an insurance contract, so that an insurance company will not be required to pay for a loss for which it did not contract to accept the risk.  *Id.*  The two established exceptions to this general rule are when the insurer misrepresented the extent of the coverage, *Huff v. Travelers Indemnity Co.*, 363 N.E.2d 985, 992 (Ind. 1977), and when the insurer assumed the defense of the insured without a reservation of rights and with knowledge of facts that would have permitted it to deny coverage, *Transcontinental Insurance Co. v. J.L. Manta, Inc.*, 714 N.E.2d 1277, 1281 (Ind. App. 1999).  Neither of these exceptions applies here.  There have been no allegations that Selective misrepresented the extent of the policy's coverage, and

Selective assumed the defense of Rain-Master under an explicit reservation of rights.

In *American Fire & Casualty Company v. Roller*, No. 29A05-0511-cv-681, 2007 WL 1139422, at *4-5 (Ind. App. Apr. 18, 2007), *transfer granted*, July 19, 2007, *transfer dismissed* Nov. 30, 2007, an insured and a third party who had allegedly been injured by the insured urged the Indiana Court of Appeals to adopt a third exception so as to estop an insurer from asserting coverage defenses when it defended the insured under a reservation of rights but acted in bad faith with regard to its insured. Specifically, the insured and the injured third party alleged that the insurer had delayed in notifying the insured that it was disputing coverage, failed to notify potentially liable subcontractors, and provided an inadequate defense by refusing to hire a necessary construction expert and by hiring counsel who had a conflict of interest. *Id.* at *2. There was evidence that the insurer's claims adjustor and his supervisor had agreed that a construction expert was needed to evaluate the claim against the insured, but the insurer did not hire an expert. The third party subsequently repaired the damage, making an expert evaluation impossible. *Id.* at *7  (Barnes, J., concurring). There was also evidence that the attorney the insurer hired to represent the insured worked for a firm that derived approximately fifty percent of its income from referrals by that insurance company. *Id.* The insured did not give written, informed consent as required by Indiana Professional Conduct Rule 1.7(a)(2) when there is a significant risk of a conflict of interest. *Id.* at *8. The attorney actually expressed concern to

the insurer that he had a severe conflict of interest (going so far as to state that "even the suggestion that I would pursue interests contrary to [the insurer] is anathema") and then continued to represent the insured for several months without taking any action to advance the insured's case against the insurer.  *Id.* at *9.

The Indiana Court of Appeals held that whether the insurer acted in bad faith was a question of fact that could not be decided at the summary judgment stage.  *Id.* at *5.  Though the court stopped short of adopting a rule that estoppel based on bad faith can preclude an insurer from denying coverage, it recognized that courts in several other states have done so, and it seemed to open the door for such a rule in Indiana.  *Id.*  The Indiana Supreme Court granted transfer on July 19, 2007 and dismissed transfer on November 30, 2007 because the parties had reached a settlement agreement.  When the Indiana Supreme Court grants a petition to transfer, the opinion of the Court of Appeals is automatically vacated, a point that the Indiana Supreme Court noted in its order dismissing transfer. See Ind. R. of App. P. 58(A).

As discussed above, a federal court sitting in diversity must apply the law of the applicable state as the highest court of the state would apply it and, absent any clear direction from the state supreme court, should place great weight on rulings of the state appellate courts.  *State Farm*, 275 F.3d at 669.  The court must, therefore, predict whether the Indiana Supreme Court would likely find that

-13-

a third party victim of an insured's wrongdoing can request estoppel of all coverage defenses based on allegations of an insurer's bad faith in its dealings with its insured. At this time, the vacated opinion in *Roller* has no precedential value but may have some persuasive value.

The Indiana Supreme Court has recognized a cause of action for tortious breach of an insurer's duty to deal with its insured in good faith because a special relationship exists between an insurer and its insured based on the unique character of their contract. *Erie Insurance Co. v. Hickman*, 622 N.E.2d 515, 518-19 (Ind. 1993). The court stated:

> Easily foreseeable is the harm that proximately results to an insured, who has a valid claim and is in need of insurance proceeds after a loss, if good faith is not exercised in determining whether to honor that claim. Given the *sui generis* nature of insurance contracts, then, we conclude that it is in society's interest that there be fair play between insurer and insured.

*Id.* (citation omitted). However, the Indiana Court of Appeals has made it clear that a third party who has been injured by an insured cannot bring a direct bad faith claim against the insurer. *Menefee v. Schurr*, 751 N.E.2d 757, 761 (Ind. App. 2001). The court reasoned that the third party is not a third party beneficiary of the relationship between the insurer and its insured, so the insurer owes no duty to the third party. *Id.*

In the face of this clear precedent, Cagnoni makes clear that it does not actually seek to bring a claim for bad faith against Selective. Instead, Cagnoni

argues that it "stands in the legal shoes" of Rain-Master because it has been injured by Rain-Master.  See *Araiza v. Chrysler Insurance. Co.*, 699 N.E.2d 1162, 1163 (Ind. App. 1998), rehearing granted in part and modified in *Araiza v. Chrysler Insurance Co.*, 703 N.E.2d 661 (Ind. App. 1998).[2]  Therefore, Cagnoni asserts, it should be able to make any arguments related to coverage that the insured is able to make.  Because Rain-Master could argue under the reasoning in *Roller* that estoppel of coverage defenses is an appropriate sanction for Selective's alleged bad faith, Cagnoni believes it should be able to make the same argument.

In *Araiza*, the Indiana Court of Appeals held that a third party who had been injured by an insured and sought recovery on a judgment obtained against the insured could present any facts and arguments against the insurer that the insured could have presented.  In that case, the insurer had filed a declaratory action to clarify its coverage obligations and had been granted a default judgment when the insured failed to appear.  *Id.*  The court found that the third party could raise all coverage issues that the insured would have been able to raise had it

_____

[2]In its response to Plaintiff's Motion for Summary Judgment, Cagnoni cites *Wolverine Mutual Insurance v. Vance* for this proposition.  Def. Resp. 11.  Though the court in that case stated that "an injured plaintiff 'stands in the shoes' of the insured," it did so in the context of holding that a third party is limited to making claims that the insured itself could have made.  *Wolverine*, 325 F.3d at 944.  The court did not state that a third party could make *every* claim that an insured could make.  As discussed above, it is clear that a third party cannot bring every claim that an insured would have been able to bring; it cannot bring a damages claim against the insurer for bad faith.  See *Menefee*, 751 N.E.2d at 761.  The issue here is whether Cagnoni can assert every possible argument that Rain-Maker could have asserted with regard to coverage.

appeared, so that the coverage issues could be decided on their merits. *Id.* While the broad language the court used in that case seems to weigh in Cagnoni's favor, the third party in that case was not seeking to estop the insurer from denying coverage. On the contrary, the court held that a third party could raise the coverage issues that the insured would have been able to raise had it not defaulted, so that the court would be able to determine the coverage issues on their merits. In contrast, Cagnoni seeks to "stand in the shoes" of the insured so that it can *avoid* resolving the coverage issues on their merits.

The reasoning of the Indiana Supreme Court in a recent case is instructive. In *State Farm Mutual Automobile Insurance Co. v. Estep*, 873 N.E.2d 1021, 1028 (Ind. 2007), the court clarified the right of an injured third party to sue an insurer for an excess judgment based on the insurer's breach of its duty of good faith to the insured. The court stated that an insured is permitted to assign voluntarily its bad faith cause of action to an injured third party as a result of a judgment against the insured in the underlying claim. The third party can then sue the insurer directly for the entire excess judgment against the insured. *Id.*, citing *Economy Fire & Casualty Co. v. Collins*, 643 N.E.2d 382, 384 (Ind. App. 1994). However, the *Estep* court held that if the insured has not voluntarily assigned his bad faith claim to the injured third party, then the third party *may not* directly sue the insurer for bad faith. *Id.* at 1028. In reaching this decision, the Indiana Supreme Court relied on the same public policies that had persuaded the court to prohibit direct actions by third parties against insurers. *Id.* at 1027. First,

-16-

allowing the third party claims would lead to multiple litigation because it would become ordinary practice for judgment creditors to assert claims against insurers when the insured parties are unable to satisfy judgments. *Id.* Second, the possibility of an excess coverage claim would provide a great deal of leverage for the third party in settlement negotiations in the underlying suit, which could lead to unwarranted settlement demands. *Id.* Finally, insurers would raise their premiums to cover the additional risks they would face, which would harm the general public. *Id.* at 1027-28.

Though here there has been no excess judgment and no assignment of a cause of action for bad faith to Cagnoni, the *Estep* court's reasoning is applicable. Rain-Master has not expressed any interest in bringing a claim for bad faith against Selective on its own. Allowing an injured third party to seek estoppel of all coverage defenses based on alleged bad faith toward the insured would lead to the same problems that the Indiana Supreme Court described in *Estep*. In both cases, there is a risk of exacerbating the potential for conflicts of interest between the insurer and the insured. Facing the possibility of a third party being able to assert estoppel of all coverage defenses, "the insurer would be forced to greater vigilance in the course of simultaneously protecting both its interest and the insured's interest." *Id.* at 1027. In addition, the increased risk would lead to higher premiums for policy holders.

In sum, Indiana precedent does not support Cagnoni's assertion that it can seek estoppel of all policy defenses to Selective's coverage of Rain-Master's liability. Even if the *Roller* decision retained any precedential value (it does not; it is limited to persuasive value), nothing in the vacated opinion suggests that a third party acting on its own would be able to assert that estoppel of all coverage defenses is an appropriate sanction for the breach of an insurer's duty of good faith to its insured. Indiana courts have made it clear that a third party cannot bring a direct claim against an insurer for bad faith. They have also examined the policy implications of allowing a third party to bring a claim for bad faith against an insurer based on an involuntary assignment of rights and have decided not to allow such claims. Estoppel is a sanction that is intended to deter the larger, more powerful insurance company from breaching its duty of good faith to its insured. See *Lloyd's & Institute of London Underwriting Cos. v. Fulton*, 2 P.3d 1199, 1209 (Alaska 2000). This court cannot predict that the Indiana courts would be willing to impose such a powerful sanction based solely on the request of an injured party that is itself unable to assert a bad faith claim. Thus, the court finds that even if Selective breached its duty of good faith to Rain-Master, Cagnoni is not entitled to estoppel of coverage defenses. As a result, Selective is entitled to summary judgment on Cagnoni's counterclaim for attorney fees and punitive damages, and Cagnoni is not entitled to summary judgment on other questions about coverage based on estoppel.

II.    *Coverage Issues for Specific Types of Damage*

Insurance policies are contracts and are subject to the rules of construction to which other contracts are subject. *Ramirez v. American Family Mutual Insurance Co.*, 652 N.E.2d 511, 514 (Ind. App. 1995). When the language is clear and unambiguous, the court gives the language its plain and ordinary meaning. *Illinois Farmers Insurance Co. v. Wiegand*, 808 N.E.2d 180, 184 (Ind. App. 2004). Insurers may limit their coverage by writing exclusions, exceptions, and conditions in their policies. *American Family Mutual Insurance Co. v. Federated Mutual Insurance Co.*, 775 N.E.2d 1198, 1206 (Ind. App. 2002). These limitations must be clearly expressed. *West Bend Mutual v. Keaton*, 755 N.E.2d 652, 654 (Ind. App. 2001). If provisions limiting or excluding coverage are ambiguous, they must be construed in favor of the insured. *Associated Aviation Underwriters v. George Koch Sons, Inc.*, 712 N.E.2d 1071, 1076 (Ind. App. 1999).

A court faced with deciding whether an insurer is responsible for covering a particular category of damages should first determine if coverage exists for the alleged damages under the insuring clause. See *Amerisure, Inc. v. Wurster Construction Co., Inc.*, 818 N.E.2d 998, 1005 (Ind. App. 2004). If the language in the insuring clause applies to the damages, the court must then consider if any exclusions exclude coverage. Finally, the court should consider if an exception to an exclusion restores coverage. "[T]he entire process must begin with an initial grant of coverage via the insuring clause; otherwise, no further consideration is necessary." *Id.* "An exception to an exclusion cannot create coverage where none

exists.   Exclusion clauses do not grant or enlarge coverage; rather, they are limitations on the insuring clause." *Id.*, citing *Indiana Insurance Co. v. DeZutti*, 408 N.E.2d 1275, 1278 (Ind. 1980).

A.   *The Rain-Master Roof*

Selective has moved for summary judgment on the issue of whether Rain-Master's policy covers damages to the Rain-Master roof and its removal and replacement.  Selective argues that these damages are not "property damage" and were not caused by an "occurrence" as defined by the policy.

1.    *Property Damage*

CGL policies contemplate two types of risks that arise from a contractor's work.   One is the business risk that the contractor will not perform well. *Amerisure*, 818 N.E.2d at 1003; *DeZutti*, 408 N.E.2d at 1279; *R.N. Thompson & Assoc., Inc. v. Monroe Guaranty Insurance Co.*, 686 N.E.2d 160, 162 (Ind. App. 1997).   The other risk is of accidental injury to people or property due to the contractor's faulty workmanship. *Amerisure*, 818 N.E.2d at 1003; *R.N. Thompson*, 686 N.E.2d at 162-63.   In a frequently cited case on this issue, the New Jersey Supreme Court explained why CGL policies cover the second type of risk but not the first:  "Unlike business risks . . . where the tradesman commonly absorbs the cost attendant upon the repair of his faulty work, the accidental injury to property or persons substantially caused by his unworkmanlike performance exposes the contractor to almost limitless liabilities." *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 791 (N.J. 1979).  Indiana courts have made it clear that the "coverage is for tort liability for physical damages to others, and not for contractual liability of the insured for economic loss suffered because the completed work is not what the damaged person bargained for." *R.N. Thompson*, 686 N.E.2d at 162.  Otherwise, the court would "effectively convert the policy into a performance bond or guarantee of contractual performance . . . ." *DeZutti*, 408 N.E.2d at 1279.[3]

---

[3]The court in *DeZutti* made this statement in relation to an exclusion related to certain types of property damage, not to language in the insuring clause.  As (continued...)

When Rain-Master entered into a contract with Cagnoni to install a new roof on the warehouse, Rain-Master bore the risk that its workmanship might be faulty and require repair. Rain-Master's insurance policy covered only accidental injury to other property or people that was caused by faulty workmanship. See *R.N. Thompson*, 686 N.E.2d at 162. If the work Rain-Master performed was not what Cagnoni bargained for, Rain-Master itself is responsible for supplying the remedy, but Selective is not.

2.  *Occurrence*

Rain-Master's CGL policy covers only property damage that is caused by an "occurrence." CGL § I(A)(1)(b). The term "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at § V(13).

Indiana courts have drawn a distinction between the definition of an "occurrence" in the context of personal physical conduct and in the context of commercial or professional conduct. *Auto-Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1283-84 (Ind. 2006). The appropriate inquiry in the context of personal physical conduct is whether the damages were "expected" or "intended." *Id.* at 1283; *Armstrong Cleaners, Inc. v. Erie Insurance Exchange*, 364 F. Supp. 2d 797,

---

[3](...continued)
the Indiana Court of Appeals noted in *R.N. Thompson*, the court's reasoning applies to the term "property damage" in general. 686 N.E.2d at 163 n.4.

810 (S.D. Ind. 2005); see also *Indiana Farmers Mutual Insurance Co. v. Ellison*, 679 N.E.2d 1378, 1382 (Ind. App. 1997) (defining expected injury as "one that occurred when the insured was 'consciously aware that the injury was practically certain to result,'" citing *Indiana Farmers Mutual Insurance Co. v. Graham*, 537 N.E.2d 510, 512 (Ind. App. 1989). In contrast, the appropriate inquiry in the context of commercial conduct is whether the damages were accidental. *R.N. Thompson*, 686 N.E.2d at 164, citing *Terre Haute First National Bank v. Pacific Employers Insurance Co.*, 634 N.E.2d 1336, 1338 (Ind. App. 1993).

The Indiana Court of Appeals has held that when there has been faulty workmanship, the failure of the product to perform as required by the contract is not an accident, at least with respect to the defective work product itself; rather, the failure to perform is the "natural and ordinary consequence" of the defective work. *Amerisure*, 818 N.E.2d at 1005; *R.N. Thompson*, 686 N.E.2d at 165.[4]

Cagnoni alleges that Rain-Master was negligent in designing and installing the roof over its warehouse. This is an allegation of faulty workmanship. Leaks in the roof are a "natural and ordinary consequence" of this faulty workmanship,

---

[4]A majority of states have held that faulty workmanship is not accidental, and therefore also not an occurrence with respect to damage to the defective work product itself. See *Amerisure*, 818 N.E.2d at 1004, citing *Indiana Insurance Co. v. Hydra Corp.*, 615 N.E.2d 70 (Ill. App. 1993); *Hawkeye-Security Insurance Co. v. Vector Construction Co.*, 460 N.W.2d 329 (Mich. App. 1990); *Heile v. Herrmann*, 736 N.E.2d 566 (Ohio App. 1999); *Pursell Construction, Inc. v. Hawkeye-Security Insurance Co.*, 596 N.W.2d 67 (Iowa 1999); *McAllister v. Peerless Insurance Co.*, 474 A.2d 1033 (N.H. 1984).

not an "occurrence" as defined by the policy.  See *Amerisure*, 818 N.E.2d at 1005; *R.N. Thompson*, 686 N.E.2d at 165.

Because the damages to the Rain-Master roof itself do not constitute property damage and were not caused by an "occurrence" as defined by Rain-Master's policy, the court grants Selective's motion for summary judgment on this issue.  As a matter of law, Selective is not responsible for covering the costs of repair, removal, or replacement of the Rain-Master roof.[5]

B.      *Other Damages*

Cagnoni also seeks a declaration that the Selective CGL policy covers all property damage to the warehouse and all consequential damages caused by the leaky roof.  The court has divided these claims into three categories:  (1) property in the warehouse and clean-up costs; (2) damage to the pre-existing roofs, steel decking, and the warehouse interior; and (3) loss of use and rent.

1.      *Property in the Warehouse and Clean-Up Costs*

While damage to the roof itself based on faulty workmanship does not constitute "property damage" and was not caused by an "occurrence," Indiana

---

[5]Because the court has found that the language of the insuring clause does not apply to these damages, it does not reach the issue of whether any of the exclusions in the policy exclude coverage of these damages.  See *R.N. Thompson*, 686 N.E.2d at 163 n.4.

courts have made it clear that CGL policies cover unexpected damage to other property.  As explained above, the policy covers tort liability for physical injuries to people and physical damage to other property caused by the faulty workmanship.  *R.N. Thompson*, 686 N.E.2d at 162.

The Selective CGL policy covers damage to any part of the warehouse (apart from the roof itself) that was caused by the leaky roof.  Some of the damages Cagnoni has listed fall squarely within this category:  damage to personal property located in the warehouse caused by water leaking through the Rain-Master roof, and clean-up costs for water that leaked through the Rain-Master roof.  Cagnoni has presented evidence that water has entered the building on several occasions, damaging the products of tenants.   Cagnoni Dep. 23-24.   Cagnoni has also presented evidence that it hired workers to clean up water damage and run dehumidifiers to minimize mold problems.  *Id.* at 21.  The court grants summary judgment in favor of Cagnoni; the policy covers these damages.  The extent of these damages remains an issue for trial, presumably after resolution of Cagnoni's claims against Rain-Master.

2.    *Pre-Existing Roofs, Steel Deck and Warehouse Interior*

Cagnoni has also requested declaratory judgment on whether damage to various parts of the warehouse is covered by the CGL policy.  Specifically, Cagnoni contends that the policy covers damage to the two pre-existing "built up" roofs below the Rain-Master roof, steel decking below the pre-existing roofs, and the interior of the warehouse.

Cagnoni has presented evidence that the two layers of pre-existing roof were damaged by Rain-Master's installation of the metal roof system.  An expert who observed the warehouse stated:  "The multiple fastener penetrations through both existing roof systems allowed water to damage the insulation in both roof systems.  The literally thousands of fastener holes in the original roof systems cannot be effectively repaired."  Baxter Report at 7.  However, as Nick Cagnoni admitted in his deposition, the pre-existing roofs were "pretty leaky" before the Rain-Master roof was installed.  Cagnoni Dep. 11.  Similarly, Cagnoni's expert stated that "there was evidence of ponded water on metal roof panels in open roof areas" before the Rain-Master roof was installed.  Baxter Report at 3.

On this record, the court cannot determine as a matter of law which problems with the pre-existing roofs were caused by the leaking Rain-Master roof and which problems had existed before Rain-Master began installing its roof.[6]

---

[6] Cagnoni argues that the concept of a pre-existing condition is irrelevant
(continued...)

-26-

These are disputed issues of material fact that cannot be decided on summary judgment. To the extent that Cagnoni can prove that Rain-Master's roof caused damage to the pre-existing roofs and can prove the extent of that damage, those damages will be covered by the CGL policy. Cagnoni has presented evidence that as a result of the Rain-Master roof's defects, it will be required to remove and replace the pre-existing roofs. If Cagnoni can also prove that it would not have been required to remove and replace the pre-existing roofs without the damage caused by the Rain-Master roof itself, the cost of the removal and replacement may also be covered by the CGL policy.

Cagnoni has also presented evidence that the steel roof deck underneath the pre-existing roofs is corroded. Cagnoni's expert stated: "There is evidence of moderate corrosion of the steel roof deck over virtually the entire roof area in question. Corrosion of the steel roof deck on the underside is pervasive and visible from the second floor." Baxter Report at 4. Selective's expert also observed corrosion to the steel deck but disputed the extent of the corrosion. Packer Report at 4-6. Again, the court cannot determine as a matter of law on this record how much of the corrosion was caused by the leaking of Rain-Master's roof and how

---

[6](...continued)
to this type of suit. The court disagrees. Selective is not required to cover damages for which Rain-Master is not liable. Rain-Master can only be liable for damages, including consequential damages, it caused to the warehouse. It cannot be held liable for damages that existed before it began installing the roof on the warehouse. Furthermore, as discussed in detail above, the policy only covers property or bodily damage that was "caused by an occurrence." A roof system that leaked before the policy holder performed any work does not constitute an "occurrence," but instead led Cagnoni to pay for an entirely new roof.

much corrosion was present prior to Rain-Master's work.  To the extent that Cagnoni can prove that Rain-Master's roof caused damage to the steel deck and can prove the extent of that damage, those damages will be covered by the CGL policy.

Finally, Cagnoni has presented evidence that leaks in the Rain-Master roof damaged the interior of the warehouse.  Cagnoni hired someone to replace drywall inside the warehouse after the Rain-Master roof began to leak.  Cagnoni Dep. 21. There is evidence that acoustic ceiling tiles have been removed from a bathroom on the second floor of the warehouse and that water stains are visible on the remaining tiles and walls.  Packer Report at 4.  To the extent that Cagnoni can prove that Rain-Master's roof caused these or other damages to the interior of the warehouse and can prove the extent of these damages, those damages will be covered by the CGL policy.  A genuine issue of material fact exists as to which of these damages were present before Rain-Master began its work, so this issue also cannot be resolved more specifically on summary judgment.

    3.    *Loss of Use/Rent*

Cagnoni has requested a declaration that the CGL policy covers loss of use and loss of rent for the second floor of the warehouse during the period after Rain-Master installed its roof.  Cagnoni argues that the policy covers lost rent because it covers all consequential damages of the leaking roof.  The CGL states that

Selective Insurance will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  CGL § I(A)(1)(a).  The CGL policy defines "property damage" to include:

    a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

In this case, the undisputed evidence shows that the failure of the Rain-Master roof (including attempts to repair it by making more holes in the pre-existing roofs) has caused substantial damage to the building.  Although the precise extent of that damage to the building remains in dispute, as discussed above, the fact that it has been damaged and portions have not been usable is not reasonably disputed.  Cagnoni raised this issue in its motion for summary judgment.  Selective has not disputed its liability for lost use in general, though there may be substantial questions about the measure of the actual lost use damages.  Cagnoni is entitled to partial summary judgment to the effect that Rain-Master's liability for lost use of the warehouse caused by the failure of the Rain-Master roof is covered by the Selective CGL policy.

III.    *Attorney Fees*

Selective has requested declaratory judgment that Cagnoni is not entitled to attorney fees and costs. Indiana Code § 34-52-1-1(b)(3) states that a court may award attorneys fees to the prevailing party if either party "litigated the action in bad faith." Cagnoni initially argued that if the fact-finder found that Selective acted in bad faith in its dealings with Rain-Master, that would also mean that Selective had litigated this action in bad faith. See *Patel v. United Fire & Casualty Co.*, 80 F. Supp. 2d 948, 962 (N.D. Ind. 2000). Cagnoni has since conceded that it has no basis for an award of attorneys fees. Def. Resp. at 15. The court, therefore, grants Selective's motion for summary judgment on this issue.

## Conclusion

The court grants Selective's motion for summary judgment to the extent of declaring that Selective is not obligated to cover the costs of repair, removal, or replacement of the Rain-Master roof or to pay attorney fees to Cagnoni. The court grants Cagnoni's motion to the extent of declaring that Selective's CGL policy covers the costs of the damage to property stored inside the warehouse and clean-up costs that are the result of the leaky roof, and loss of use of the warehouse caused by the failure of the Rain-Master roof and efforts to repair it. The court denies Cagnoni's motion for summary judgment as to damages to the pre-existing roofs, the steel roof deck, and the interior of the warehouse because material issues of fact exist as to the extent to which those damages were actually caused by the Rain-Master roof.

So ordered.

Date: January 10, 2008

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Adam  Arceneaux
ICE MILLER LLP
adam.arceneaux@icemiller.com

Brian Edward Bailey
ICE MILLER LLP
brian.bailey@icemiller.com

Brent W. Huber
ICE MILLER LLP
brent.huber@icemiller.com

Lonnie D. Johnson
MALLOR CLENDENING GRODNER & BOHRER
ljohnson@mcgb.com

Jeffrey E. Nimz
jenimz@aol.com

Patrick B. Omilian
MALLOR CLENDENING GRODNER & BOHRER LLP
pomilian@mcgb.com